**Slip Op. 09–28**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

FORMER EMPLOYEES OF
HUTCHINSON TECHNOLOGY,
INC.,

                      Plaintiff,

       v.

UNITED STATES,

                      Defendant.

</td><td>

**Before: Gregory W. Carman, Judge**

Court No. 07-00335

**PUBLIC VERSION**

</td></tr>
</table>

[*Plaintiff's motion for judgment on the agency record is denied; decision of the Department of Labor is affirmed.*]

Edmund Maciorowski, P.C. (Edmund Maciorowski), for Plaintiff.

Michael F. Hertz, Acting Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David M. Hibey); and Stephen L. Jones, Office of the Solicitor, United States Department of Labor, of counsel, for Defendant.

April 9, 2009

## OPINION

**CARMAN, JUDGE:** This case is before this Court pursuant to Plaintiff's Motion for Judgment on the Agency Record (USCIT R. 56.1). Based on the following analysis, the Court denies Plaintiff's motion and sustains the decision of the Department of Labor.

## BACKGROUND

Hutchinson Technology, Inc., is a manufacturer of suspension assemblies for disk drives. (Admin. Record ("AR") at 7.) The Plaintiff, Former Employees of Hutchinson Technology, Inc. was separated from Hutchinson Technology, Inc. ("Hutchinson") during the week of June 4, 2007. (Pl.'s Mot. for Summ. J. on the Agency Record ("Pl.'s Mot.") 3.) Plaintiff submitted an application for Trade Adjustment Assistance ("TAA" or "worker adjustment assistance") and Alternative Trade Adjustment Assistance ("ATAA") on June 21, 2007. (*Id.*) This application was denied on July 10, 2007 (*Id.*) on the grounds that "[t]he subject firm did not shift production abroad, nor does it import suspension assemblies for disk drives." (AR at 19.) After Plaintiff filed this case, Defendant U.S. Department of Labor ("Labor") sought, and was granted, a voluntary remand for further investigation of Plaintiff's claim with respect to "additional information regarding the subject firm's customers." (Supp. Admin. Record ("SAR") at 32.) This voluntary remand also resulted in a negative determination on January 18, 2008. (Pl.'s Mot. 4.) Plaintiff now requests that the Court "grant judgment in [its] favor . . . pursuant to 19 U.S.C. § 2395(c) and USCIT R. 56.1." (*Id.*) This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(d)(1) (2000).

### Standard of Review

The court will sustain the Department of Labor's determination if it is supported

by substantial evidence and is otherwise in accordance with law. 19 U.S.C. § 2395(b)

(2000); *see also Woodrum v. Donovan*, 5 CIT 191, 193, 564 F.Supp. 826, 828 (1983), *aff'd*, 737

F.2d 1575 (Fed. Cir. 1984). The findings of fact by the Secretary are conclusive if

supported by substantial evidence. 19 U.S.C. § 2395(b) (2000). "Substantial evidence is

something more than a 'mere scintilla,' and must be enough reasonably to support a

conclusion." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp.

961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) (citations omitted). "Additionally,

'the rulings made on the basis of those findings [must] be in accordance with the statute

and not be arbitrary and capricious, and for this purpose the law requires a showing of

reasoned analysis.'" *Former Employees of Gen. Elec. Corp. v. U.S. Dep't of Labor*, 14 CIT

608, 611 (1990) (*quoting Int'l Union v. Marshall*, 584 F.2d 390, 396 n. 26 (D.C. Cir. 1978)).

## DISCUSSION

In order to qualify for worker adjustment assistance as directly-impacted

(primary) workers, the Department of Labor must first find that

> (1) a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become totally or partially separated, or are threatened to become totally or partially separated[.]

19 U.S.C. § 2272(a)(1) (Supp. V 2005). In addition, Labor must find that one of two sets

of further criteria are satisfied. The first set of criteria is satisfied if Labor finds that

> (2)(A)(i) the sales or production, or both, of such firm or subdivision have

decreased absolutely;
    **(ii) imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and**
    (iii) the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision;

19 U.S.C. § 2272(a)(2)(A) (Supp. V 2005) (emphasis added).  In this case, Labor found that there had been no increase of imports of articles like or directly competitive with the article produced by Hutchinson, and therefore denied Plaintiff eligibility under the first set of criteria.  (AR at 19 (*see also* SAR at 75–77 (reaching the same conclusion after Labor's voluntary remand)).)

A group of displaced workers may also qualify for primary TAA benefits if Labor finds the second set of criteria is satisfied, namely that

    (B)(i) there has been a **shift in production** by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and
    (ii)(I) the country to which the workers' firm has shifted production of the articles **is a party to a free trade agreement** with the United States;
    (II) the country to which the workers' firm has shifted production of the articles **is a beneficiary country under the Andean Trade Preference Act . . . , African Growth and Opportunity Act . . . , or the Caribbean Basin Economic Recovery Act . . . ;** or
    (III) there has been or is likely to be an **increase in imports** of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272(a)(2)(B) (Supp. V 2005) (emphasis added).  In its first determination in this case, Labor found that Hutchinson had not shifted production abroad, and thereby

concluded that Plaintiff did not qualify for TAA benefits under this second set of criteria. (AR at 19 (*see also* 19 U.S.C. § 2272(a)(2)(B)(ii)(I), highlighted above.) After voluntary remand, Labor considered whether "sorting" work constituted production. Labor determined that sorting was not production, but even if it was, none of the three additional factors was satisfied. (SAR at 77–78 (*see also* 19 U.S.C. § 2272(a)(2)(B)(ii)(I), (II), and (III), highlighted above.) That is to say, sorting work had not been shifted to a country described in sections (B)(ii)(I) or (II) above, and there was also no evidence of an increase in imports of articles like or directly competitive with those produced by Hutchinson, as indicated in (B)(ii)(III), above.

Plaintiff contends that Labor erred in several respects by denying it the right to TAA and ATAA benefits in this case, and targets the bulk of its arguments along three lines.[1] First, Plaintiff argues that Hutchinson has shifted production abroad. (Pl.'s Mot. 5–8.) Second, Plaintiff argues that there has been an increase of imports of articles like

---

[1]Plaintiff also asserts a sundry of additional arguments, all of which the Court has considered, but none of which militate in favor of issuing a judgment for Plaintiff based on the agency record. Plaintiff argues, *inter alia*, that the questions posed by Labor in the investigation were "broad" and "vague" (Pl.'s Mot. at 12), that Labor demonstrated a "cavalier attitude . . . and prejudices" in its investigation (*id.*), that the Plaintiff is entitled to more lenience because it initially appeared before the Court *pro se in forma pauperis*, (*id.* at 16), that Labor was required to obtain "the description of the assemblies produced by Hutchinson" and to affirmatively determine "what constitutes a like or directly competitive product" (*id.* at 20) and that the value of sales to Hutchinson's major customer "vary wildly throughout the administrative record without explanation" (*id.* at 22).

or directly competitive with the articles produced by Hutchinson. (*Id.* 13–20.) Third, Plaintiff raises an argument that it did not make before the agency: that it qualifies as an adversely affected secondary worker pursuant to 19 U.S.C. § 2272(b). (*Id.* 21–23.)

## I.     Issue 1: Whether Plaintiff Shifted Production Abroad

### A.     Parties' Contentions on Issue 1

The products that Plaintiff had been chiefly engaged in producing while employed at Hutchinson were suspension assemblies for disk drives—a product line known as Argon. (SAR at 29.) Labor determined that the primary cause for Plaintiff's separation from Hutchinson was a decline in exports of Argon to Hutchison's primary customer. (AR at 19.) Consequently, Plaintiff could not qualify for TAA benefits under the second set of criteria described above because production of Argon (or a like or directly competitive product) had not shifted abroad. *See* 19 U.S.C. § 2272(a)(2)(B)(i).

Plaintiff argues that the record reflects that some of the terminated employees "were engaged in the 'sorting' of suspension assemblies at the subject firm's Wisconsin facility prior to the separation," and that such sorting constitutes production. (Pl.'s Mot. 5 (*citing* SAR at 47 and 66.).) Plaintiff criticizes Labor for relying "solely on the reports of the subject firm" in determining that sorting did not constitute production. (*Id.* at 8–10.) Plaintiff argues that considering the "unrebutted description of the 'sorting process'" in light of case law establishes that quality control work, such as sorting, is "a

clear part of the production process." (*Id.* at 6–7.) Plaintiff then argues that the record is vague about whether or not Hutchinson shifted this alleged "production" to a country with a free trade agreement with the United States, namely, [[            ]]. (*Id.* at 10–12 (*see also* 19 U.S.C. § 2272(a)(B)(ii)(I)).)

Defendant responds by arguing that sorting does not constitute production in this instance. (Def.'s Mem. in Opp. to Pl.'s Mot. for J. upon the Agency R. ("Def.'s Resp.") 11–13.) Furthermore, Defendant contends that its investigation was sufficiently thorough, and that there is no record evidence that Hutchinson shifted any production to any other country, much less to a country with a free trade agreement with the United States. (Def.'s Resp. 7–9.)

### B.      Analysis on Issue 1

On this issue, the Court must decide whether there is substantial evidence on the record to support the Defendant's finding that the sorting performed by Plaintiff is not production, or to support the Defendant's finding that no production had been shifted to a preferred country described in the statute. Setting aside the issue of whether or not sorting constitutes production, this Court finds that there is substantial evidence to support Labor's determination that no production was shifted to "a party to a free trade agreement with the United States" or to "a beneficiary country under the Andean Trade Preference Act, African Growth and Opportunity Act, or the Caribbean Basin Economic

Recovery Act." <u>See</u> 19 U.S.C. § 2272(a)(2)(B)(ii)(I)–(II) (Supp. V 2005).

First, when asked about its foreign facilities in [[

]] Hutchinson responded that [[



]]  (SAR at 36.)  Acting on Plaintiff's claim that sorting

might constitute production and sorting may have been shifted to "Singapore, Thailand,

and/or China" (SAR at 29–30), Labor made further inquiries of both Hutchinson and the

petitioner Larry Haus.  Hutchinson indicated that [[



]]  (SAR at 47.)  The petitioner, Larry Haus, indicated in

response to Labor's inquiry that he [[

]]

(SAR at 64.)  Upon this suggestion, Labor specifically asked Hutchinson in a written

questionnaire, and received the answers highlighted below:

[[



]]

(SAR at 66 (emphasis added).)

Plaintiff makes much of Hutchinson's answer to question 6, above. Specifically, Plaintiff claims that in this answer, Hutchinson "ignor[ed] a pointed question about whether any [[                                        ]]" (Pl.'s Mot. 11), and that "details concerning [                                        ]] asked but not yet answered, are necessary." (Pl.'s Rep. to Def.'s Mem. in Oppo. to Pl.'s Mot. for Summ. J. upon the Agency R. ("Pl.'s Rep.") 8.) This Court does not share Plaintiff's concern about Hutchinson's answer to these questions. Rather, based on the answer to question 6 along with all the other evidence detailed above, this Court holds that there is substantial evidence in support Labor's conclusion that any shifted production did not go to a preferred country within the meaning of the statute. *See* 19 U.S.C. § 2272(a)(2)(B)(ii)(I)–(II) (Supp. V. 2005). Consequently, the Court does not reach the issue of whether or not "sorting" constitutes production.

## II.    Issue 2: Whether There has been an Increase in Imports of Articles Like or Directly Competitive with the Domestic Product

### A.    Parties' Contentions on Issue 2

#### 1.    Importation of Hard Drives

Plaintiff also argues that Labor's finding that there had been no increase of imports of articles like or directly competitive with the articles produced by Hutchinson is not in accordance with law. (Pl.'s Mot. 13-20.) This is an element of both sets of criteria for receiving TAA benefits listed in the statute, 19 U.S.C. § 2272(a)(2)(A)(ii) and

(B)(ii)(III).  *See* Discussion, *supra* 3–4.  Although Plaintiff does not point to an independent increase in imports of suspension assemblies, Plaintiff argues that suspension assemblies have been imported into the United States as components of fully constructed hard drives.  (Pl.'s Mot. 13.)  To this end, Plaintiff points to a portion of 29 C.F.R. § 90.2, which explains that

> An imported article is *directly competitive with* a domestic article at an earlier or later stage of processing, and a domestic article is *directly competitive with* an imported article at an earlier or later stage of processing, if the importation of the article has an economic effect on producers of the domestic article comparable to the effect of the importation of articles in the same stage of processing as the domestic article.

29 C.F.R. § 90.2 (2006) (italics in original) (hereinafter "Relevant Language"); *(see also* Pl.'s Mot. 13.)  Plaintiff contends that imported hard drives "may very well have an economic effect on the producer of the suspension assemblies comparable to the effect of an increase in imported suspension assemblies," and consequently these imported hard drives could be directly competitive with suspension assemblies, and could possibly serve as a basis for Plaintiff to recover TAA/ATAA benefits.  (Pl.'s Mot. 13.)

Defendant pointed out in its Notice of Negative Determination on Remand that this court has previously held that when an imported article includes the domestic article as a component, the imported article cannot be considered "directly competitive" with that component.  (SAR at 76–77 (*citing UAW, Local 834 v. Donovan*, 8 CIT 13, 17–20, 592 F. Supp. 673, 677–79 (1984)).)

### 2. Sales to Hutchinson's Major Customer

Plaintiff makes an alternative argument with respect to importation of like or directly competitive articles. Challenging Labor's finding that Plaintiff was laid off due to decreased **exports** to Hutchinson's major customer, Plaintiff argues that the record is inconsistent about whether sales to Hutchinson's major customer were **exports** or **domestic sales**. (Pl.'s Mot. 21–23.) Plaintiff argues that Labor merely "theorize[d] that [the purchases of a competitor's product] are not imported into the U.S." (*Id.* at 21.) Apparently, Plaintiff's theory is that if Hutchinson's sales to its major customer were not exports, but rather domestic sales which the purchaser then shipped overseas, it is possible that when the customer purchased suspension assemblies from Hutchinson's competitor that those products were first imported into the United States before being similarly exported. (*See id.* at 21–23.)

Defendant responds to this argument by pointing out that "Hutchinson never considered [its major customer] a domestic customer," but rather as a foreign customer to which it would export suspension assemblies. (Def.'s Resp. 7 (*citing* SAR at 39.)) Thus, Defendant contends that both of Plaintiff's arguments fail with respect to the importation of like or directly competitive articles.

### B. Analysis on Issue 2

#### 1. Importation of Hard Drives

The issue for the Court to decide on the first of these two arguments is whether Labor's determination that "increased imports of computer hard drives cannot be the basis for the certification of the subject worker group," because "suspension assemblies are not like or directly competitive with the computer hard drives produced abroad and imported," is based on substantial evidence and is otherwise in accordance with law. (SAR at 76–77 (*see also* 19 U.S.C. § 2272(a)(2)(A)(ii).))  This Court holds that it is.

Plaintiff misapprehends the operation of the Relevant Language of 29 C.F.R. § 90.2.  Specifically, Plaintiff rushes the analysis required by this regulation by suggesting that Labor erred when it failed to determine whether the importation of hard drives would have the same economic effect as the importation of suspension assemblies.  (*See* Pl.'s Mot. 13.)  What Plaintiff has not addressed are the circumstances that trigger the applicability of the Relevant Language, *i.e.*, when an imported article represents the domestic article at an earlier or later stage of processing.

The Relevant Language from 29 C.F.R. § 90.2 is directly quoted from a definition statute in the Trade Act of 1974, 19 U.S.C. § 2481(5) (2000).  This Court has previously explained the origin of the Relevant Language by resort to legislative history.  *See W. Conference of Teamsters v. Brock*, 13 CIT 169, 177–78, 709 F. Supp. 1159, 1166–67 (1989) (*citing* H.R. REP. NO. 87-1818, at 24 (1962)).  Essentially, the legislative history reveals that Congress determined that a government agency had construed the definition of

"directly competitive" too narrowly when that agency decided that a "raw cherry" was not "directly competitive" with a "glace cherry." *See id.* Congress reacted to the agency's decision by enacting a law with the Relevant Language permitting articles in different stages of production (such as raw cherries and glace cherries)[2] to be considered directly competitive with one another for the purposes of the Trade Act of 1974, when certain economic conditions are met. *See id.* In other words, even if two products do not meet the ordinary definition of "directly competitive," because they are not "substantially equivalent for commercial purposes," they may be *constructively considered* directly competitive for the purposes of the Trade Act of 1974, if the Relevant Language applies. *See* 29 C.F.R. § 90.2.

A plain reading of the Relevant Language from 29 C.F.R. § 90.2 reveals its inapplicability in this case. As this court has previously explained, the Relevant Language is only implicated if the imported product is an earlier or later stage of processing of the domestic product, or vice versa. *See Former Employees of Murray Eng'g, Inc. v. United States*, 29 CIT 648, 651-54, 387 F. Supp. 2d 1229, 1232-35 (2005). Based on

---

[2]The legislative history to this statute explains, "the term 'earlier or later stage of processing' contemplates that the article *remains substantially the same during such stages of processing, and is not wholly transformed into a different article*. Thus, for example, zinc oxide would be zinc ore in a later stage of processing, since it can be processed directly from zinc ore. For the same reason, a raw cherry would be a glace cherry in an earlier stage of processing, and the same is true of a live lamb and dressed lamb meat . . . ." *Brock*, 13 CIT at 178 (*quoting* H.R. REP. NO. 87-1818, at 24 (1962) (emphasis added)).

Labor's determination that "[s]uspension assemblies are components of computer hard drives, which incorporate multiple components," SAR at 76, it is clear to this Court that an assembled hard drive is not a suspension assembly at a later stage of processing, nor is a suspension assembly a hard drive at an earlier stage of processing.[3] Because of this, Labor was not required to reach the second step in the determination: whether "the importation of the article has an economic effect on producers of the domestic article comparable to the effect of importation of articles in the same stage of processing as the domestic article." 29 C.F.R. § 90.2. Based on the foregoing analysis, the Court holds that Labor's determination regarding the importation of like or directly competitive products is based on substantial evidence and is otherwise in accordance with law.

2.    Sales to Hutchinson's Major Customer

The Court notes that whether Hutchinson's sales to its major customer "are categorized as foreign sales, or are to be considered domestic sales," is not ultimately

---

[3]The Court notes that when Labor finds that the domestic and imported products do not meet the definition of like or directly competitive, it would still be prudent for Labor to affirmatively assess whether or not the imported and domestic articles represent different stages of processing of essentially the same item. If Labor does not make such a determination, it may face a remand, depending on the circumstances of the case. For instance, the relationship between the imported and domestic articles in *Murray* was close enough that the court remanded that case to decide whether "designs for heavy machinery represent an earlier stage of processing of the products manufactured on such machines." *Former Employees of Murray Eng'g, Inc. v. United States*, 28 CIT 1873, 1878, 358 F. Supp. 2d 1269, 1275 (2004).

dispositive of Plaintiff's claim for TAA/ATAA benefits. (Pl.'s Mot. 22.) The only issue for the Court to resolve with respect to this argument by Plaintiff is whether Labor's conclusion that "no suspension assembly products have been imported into the United States by this customer" is supported by substantial evidence on the record and is otherwise in accordance with law. (SAR at 76.) This Court holds that it is.

There are two pieces of evidence in the administrative record which support Labor's conclusion that when Hutchinson's major customer stopped purchasing suspension assemblies from Hutchinson and started purchasing them from a competitor of Hutchinson, that it did not import these suspension assemblies into the United States. The first piece of evidence is a comment written by a Labor investigator on a Hutchinson Technology Sales Analysis report stating that the major customer "[[

]] (SAR at 67.) The second piece of evidence in the administrative record supporting this conclusion is a handwritten comment, also written by a Labor investigator on a customer survey of Hutchinson's major customer, pointing to the first piece of evidence. (SAR at 46.) While marginalia comments written by Labor investigators are not as compelling as emails or notes of phone calls with affected parties in a given case, the Court finds that this evidence is more than a "mere scintilla," and therefore constitutes substantial

evidence to support Labor's conclusion. *See Ceramica Regiomontana*, 10 CIT at 405, 636 F. Supp. at 966.

## III. Issue 3: Whether Plaintiffs were Adversely Affected Secondary Workers

### A. Parties' Contentions on Issue 3

Plaintiff also argues Labor should have considered whether or not Plaintiff was qualified to receive TAA/ATAA benefits as a group of "adversely affected secondary worker[s]," as defined by 19 U.S.C. § 2272(b). (Pl.'s Mot. at 15–20.) Plaintiff argues that although it did not indicate it was applying for benefits as an adversely affected secondary worker, the mere application for any TAA/ATAA both put Labor on notice that it was challenging the entire "decision of Defendant as noticed in the Federal Register," and that Labor has an obligation to "take the lead in pursuing relevant facts," with respect to certification for secondary adjustment assistance.[4] (*Id.* at 18–19.)

---

[4]In its motion, it appears that Plaintiff uses the terms "Alternative Trade Adjustment Assistance" and "secondary adjustment assistance" (or "adversely affected secondary worker") interchangeably. For instance, Plaintiff argues that because the title of the application for TAA benefits includes the term "**Alternative Trade Adjustment Assistance**[, i]t follows that the completion of this application is for primary and **secondary adjustment assistance**." (Pl.'s Mot. 15 (emphasis added).) Later, Plaintiff suggests that Defendant did not determine whether Plaintiff qualified for secondary adjustment assistance because Plaintiff had failed to check a box "to qualify for **alternative trade adjustment assistance**." (*Id.* 16 (emphasis added).) Defendant actually discussed the box-checking in the context of whether or not it could have known that Plaintiff wanted to be considered an **adversely affected secondary worker**. (Def.'s Resp. to Pl.'s Remand Cmts. 9.) Still later, Plaintiff claimed that if Defendant had performed its investigation properly, "it would have easily uncovered ample evidence

In response to this argument, Defendant points out that Plaintiff raised this argument for the first time in its response to Labor's negative determination on remand. (Def.'s Resp. 13.) Plaintiff did not indicate it was seeking certification based on 19 U.S.C. § 2272(b) when it filed its initial TAA petition, or during the course of Labor's voluntary remand. (*Id.*) Nevertheless, Defendant points out that it considered the possibility that Plaintiff might qualify for benefits as an adversely affected secondary worker in October 2007. (*Id.*) After learning that one of Hutchinson's customers had been certified for TAA in one of its branches a particular location, Labor investigated whether Hutchinson had been a supplier for this Customer at the particular location but determined that Plaintiff did not meet the requirements for such benefits. (*Id.* 13–14 (*citing* SAR 45).)

### B. Analysis on Issue 3

---

supporting certification under the **alternative form of trade adjustment assistance**." (Pl.'s Mot. 17 (emphasis added).) The context of this sentence makes clear that Plaintiff actually intended to refer to its qualification as an **adversely affected secondary worker**. (*See id.*)

Alternative trade adjustment assistance ("ATAA") is a program established to provide certain benefits to "older workers" when certain conditions are met. 19 U.S.C. § 2318(a) (Supp. V 2005). The term "adversely affected secondary workers" refers to group of workers that qualifies for Trade Adjustment Assistance benefits as a consequence of having been a "supplier or downstream producer to a firm (or subdivision) that employed a group of workers who received a certification of eligibility under [the primary form of TAA certification found in] subsection (a) of this [statute]." 19 U.S.C. § 2272(b)(2) (Supp. V 2005).

The issue for the Court to resolve in addressing this argument by Plaintiff is whether Labor's decision on Remand is supported by substantial evidence and otherwise in accordance with law, even though that decision did not explicitly address whether Plaintiff qualified for TAA/ATAA benefits as an adversely affected secondary worker pursuant to 19 U.S.C. § 2272(b). This Court holds that it is.

When Plaintiff filed its petition with Labor in this case, Plaintiff did not indicate that it sought certification for TAA/ATAA benefits as an adversely affected secondary worker.[5] While Plaintiff's failure to indicate that it was requesting such certification in its petition is not necessarily fatal, the fact that Plaintiff failed to raise such a request until after Labor issued its Notice of Negative Determination on Remand, is. (Def.'s Resp. 13 (*see also* Pl.'s Mot. 15–20.).) While there are no minimum pleading

---

[5]In the Petition for TAA and ATAA filled out by the TAA Coordinator for the state of Wisconsin on behalf of Plaintiff, Section 3 states:

> [i]n your opinion, does the worker group work at a firm or subdivision that has: (check appropriate box(es) below)
>
> a) ☐ • Increased imports of like or directly competitive article(s) from a foreign country(s)
>
> ☒ • Shifted production of the article(s) to a foreign country(s)
>
> ☒ • Customers that have increased imports from a foreign country(s)
>
> b) ☐ Supplied component parts for articles produced by a firm with a currently TAA certified worker group
>
> c) ☐ Assembled or finished articles provided by a firm with a currently TAA certified worker group

(AR at 2.) The petitioner only checked the boxes indicated above. (*Id.*) Subsections (b) and (c) in this portion of the petition correlate with the language of qualifications for adversely affected secondary workers. *See* 19 U.S.C. § 2272(b).

requirements, as such, before the agency, Labor must have **some** reason to know that a given group of displaced workers desires to be certified as eligible for TAA/ATAA benefits as adversely affected secondary workers. It appears that Labor was given no such reason in this case until after Plaintiff filed is motion in this case, which makes the fact that Labor investigated this issue of its own initiative all the more commendable. (*See* SAR at 45.) Labor was therefore not required to explicitly address Plaintiff's status as an adversely affected secondary worker in its Notice of Negative Determination on Remand.

### CONCLUSION

For the foregoing reasons, Labor's Notice of Negative Determination on Remand is supported by substantial evidence and is otherwise in accordance with law. The decision of the Department of Labor is affirmed. Judgment to be entered accordingly.

/s/   Gregory W. Carman

Gregory W. Carman, Judge

Date:   April 9, 2009
        New York, New York